*Miller v. McDonald*

# In the
# United States Court of Appeals
## For the Second Circuit
_____

August Term 2024
Argued: November 18, 2024
Decided: March 3, 2025

Docket No. 24-681

JOSEPH MILLER, EZRA WENGERD, JONAS SMUCKER, DYGERT ROAD SCHOOL,
PLEASANT VIEW SCHOOL, SHADY LANE SCHOOL,

*Plaintiffs-Appellants,*

v.

JAMES V. MCDONALD, in his official capacity as Commissioner of Health of the
State of New York,

*Defendant-Appellee,*

BETTY A. ROSA, in her official capacity as Commissioner of Education of the State
of New York,

*Defendant.*[*]

_____

Before:            CABRANES, WESLEY, and LEE, *Circuit Judges.*

_____

In 2019, New York repealed the religious beliefs exemption to its school immunization law. The law now applies to all students attending public, private,

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

or parochial schools, except those who qualify for the law's medical exemption. Two parents of Amish students, three Amish "community schools," and an elected representative of all Amish schools in New York sued New York officials under 42 U.S.C. § 1983, claiming that the school immunization law infringes on their free exercise rights under the First and Fourteenth Amendments. The parents view their claims as similar to the combined parental and free exercise rights brought by Amish parents in *Wisconsin v. Yoder*, 406 U.S. 205 (1972). Plaintiffs moved for a preliminary injunction; Defendants opposed the preliminary injunction and moved to dismiss. The United States District Court for the Western District of New York (Elizabeth A. Wolford, *Chief Judge*) granted the motion to dismiss, concluding that Plaintiffs failed to allege a constitutional violation, and denied the preliminary injunction request as moot. We agree with the district court's sound reasoning and therefore **AFFIRM**.

————————————

SHANNON G. DENMARK, Lehotsky Keller Cohn LLP, Austin, TX (Kyle Hawkins, Lehotsky Keller Cohn LLP, Austin, TX; Christopher D. Wiest, Covington, KY; Hiram Sassar, Justin Butterfield, First Liberty Institute, Plano, TX; Elizabeth A. Brehm, Walker D. Moller, Siri & Glimstad LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellants*.

MARK S. GRUBE, Senior Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Andrea Oser, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General of the State of New York, New York, NY.

Steve Marshall, Alabama Attorney General, Edmund G. LaCour Jr., Alabama Solicitor General, Robert M. Overing, Alabama Deputy Solicitor General, *for Amici Curiae State of Alabama and 19 Other States*.

————————————

PER CURIAM:

New York has long regulated immunization in schools. In 1860, New York "directed and empowered" school officials to deny the admission of unvaccinated students,[1] making it the second state in the nation to mandate school vaccination.[2] In 1966, New York enacted a school immunization law in which students who could not be vaccinated for medical reasons or students whose parents held religious objections to vaccines were exempted.[3]

New York maintained both exemptions until 2019. During 2018 and 2019, the United States experienced the worst measles outbreak in over twenty-five years; New York was the epicenter. Most cases occurred in communities with clusters of unvaccinated individuals. Following that outbreak, the legislature repealed the religious beliefs exemption while retaining the medical exemption.

Plaintiffs-Appellants are three "Amish community schools"—Dygert Road School, Pleasant View School a/k/a Twin Mountain School, and Shady Lane School—that have been fined for failing to comply with New York's immunization

---

[1] Ch. 438 § 1, 1860 N.Y. Laws 761, 761.

[2] *See* John Duffy, *School Vaccination: The Precursor to School Medical Inspection*, 33 J. Hist. Med. & Allied Scis. 344, 346 (1978).

[3] Ch. 994 § 2, 1966 N.Y. Laws 3331, 3332–33.

3

law; Ezra Wengerd, an elected representative of all Amish schools in New York; and Jonas Smucker and Joe Miller, board members of their children's Amish community schools (collectively, "Plaintiffs"). The schools do not require a certificate of immunization to attend because the parents "have sincerely held religious beliefs which do not permit them to inject" their children with vaccines.[4] J.A. 13.

Plaintiffs brought a claim pursuant to 42 U.S.C. § 1983 against Defendant-Appellee Dr. James V. McDonald, in his official capacity as the Commissioner of Health of the State of New York ("the State"), alleging that the immunization law infringes on their free exercise rights under the First and Fourteenth Amendments.[5] The parents also argue that the law is unconstitutional because it impairs Amish parents' right to control the religious upbringing of their children as recognized in *Wisconsin v. Yoder*, 406 U.S. 205 (1972). Plaintiffs moved to

---

[4] For purposes of reviewing the district court's decision on the motion to dismiss, we accept as true the facts alleged in the complaint. *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015) (per curiam).

[5] Plaintiffs also brought official-capacity claims against Dr. Betty A. Rosa, the current Commissioner of Education of the State of New York. The district court granted the State's motion to dismiss those claims for lack of standing. Because Plaintiffs do not appeal that aspect of the district court's decision, we do not address it.

preliminarily enjoin the law's enforcement against them; the State moved to dismiss. Chief Judge Elizabeth A. Wolford granted the State's motion to dismiss, concluding that Plaintiffs failed to plausibly allege a constitutional violation. The court denied Plaintiffs' request for a preliminary injunction as moot. We affirm.

## BACKGROUND[6]

New York Public Health Law § 2164 requires that children who attend public, private, or parochial schools for more than fourteen days be immunized against certain diseases. N.Y. Pub. Health Law § 2164(1), (2)(a), (7). As noted above, New York previously allowed two exemptions from that requirement: if a licensed physician certified that immunization would be "detrimental to a child's health," *id.* § 2164(8), or if a child's parent or guardian held "genuine and sincere religious beliefs which are contrary to the [vaccination] practices," *id.* § 2164(9) (repealed 2019).

The legislature repealed the religious beliefs exemption on June 13, 2019. The legislature recognized that "sustaining a high vaccination rate among school

---

[6] The following facts are drawn from Plaintiffs' verified complaint and the legislative and administrative records. *See Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022). Consistent with the parties' briefs, we also draw from the preliminary injunction record.

children is vital to the prevention of disease outbreaks, including the reestablishment of diseases that have been largely eradicated in the United States, such as measles."  N.Y. Bill Jacket at 4A, 2019 A.B. 2371, Ch. 35.[7]  Immunization rates in New York had plummeted "far below the [Centers for Disease Control and Prevention]'s goal of at least a 95% vaccination rate to maintain herd immunity."[8]  *Id.*  Data from 2013 and 2014 indicated that "at least 285 schools in New York" had "an immunization rate below 85%, including 170 schools below 70%."  *Id.*

Shortly before its repeal, the percentage of students invoking the religious exemption in private and parochial schools increased from 0.54% to 1.53%.  N.Y. Senate, Tr. Floor Proceedings, 242d Sess. 5250, 5389 (June 13, 2019) ("Senate Tr.").  Indeed, its use tripled or quadrupled in some areas.  *Id.*  In six schools in Rockland County—the hotspot of the measles outbreak—up to 20% of students had religious exemptions.  N.Y. Assembly, Tr. Floor Proceedings, 242d Sess. 1, 58–59 (June 13,

---

[7] We accord "contemporaneous interpretation of a statute . . . considerable weight in discerning legislative intent."  *Brokamp v. James*, 66 F.4th 374, 398 n.22 (2d Cir. 2023) (quoting *Vatore v. Comm'r of Consumer Affs.*, 83 N.Y.2d 645, 651 (1994)).

[8] "Herd immunity" refers to the percentage of individuals in a community who must be vaccinated to reduce the likelihood of a vaccine-preventable disease's transmission.  J.A. 584.

2019) ("Assembly Tr."). Religious exemptions far outpaced medical exemptions—five to one. *Id*. at 70.

In November and December 2021, New York's Department of Health ("DOH") audited Plaintiff schools' compliance with the immunization law. In March 2022, the DOH concluded that students went to those schools for more than fourteen days during the 2021–2022 school year without a certificate of immunization, documentation of immunity, or a signed medical exemption. It therefore charged the schools with violating § 2164(7)(a). After an administrative hearing, the Commissioner of Health sustained the charges and imposed fines totaling $118,000.[9]

---

[9] Each violation of § 2164 is subject to a fine of up to $2,000. The DOH considers each day that an unvaccinated student attends school to be a violation. The Commissioner of Health concluded the total fines were "principled and conservative under the circumstances." J.A. 127. More specifically, the Commissioner of Health's order imposed a $52,000 fine against Dygert Road School, a $46,000 fine against Twin Mountains School, and a $20,000 fine against Shady Lane School. To calculate the fines against Dygert Road and Twin Mountains, the DOH multiplied the number of out-of-compliance students in each school by the maximum penalty (under the modest assumption that each of those students was out of compliance for only one day). Because Shady Lane provided no documentation for its students, the DOH assumed that one student was not compliant for at least ten days.

7

On June 2, 2023, Plaintiffs sued the State under 42 U.S.C. § 1983, claiming that New York Public Health Law § 2164 violates their First and Fourteenth Amendment rights. They allege that the Amish faith commands a self-reliant lifestyle separate from the modern world. As a consequence of their "commitment to a century's old way of life," "many Amish maintain profound religious objections to vaccines." J.A. 11. "Their beliefs also consider abortion murder and aborted fetuses are inextricably intertwined with vaccine development . . . ." J.A. 35. Consistent with those religious beliefs, Plaintiff schools "do not require proof of vaccination from students to attend school." J.A. 11.

Plaintiffs refuse to comply with § 2164—either by vaccinating or homeschooling their children. They assert that "a vital part of [Amish] children's spiritual development" is to learn "in a group setting." J.A. 15. They contend the fines and threat of additional penalties will shutter the Amish community's schools and their ability to educate children in a group setting. Plaintiffs sought an injunction to prohibit the State's enforcement of § 2164 against them, a declaration of the law's unconstitutionality as applied to them, and attorney's fees.

Shortly after filing their complaint, Plaintiffs moved for a preliminary injunction. The State opposed the preliminary injunction request and moved to

8

dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the State's motion to dismiss.[10] *Miller v. McDonald*, 720 F. Supp. 3d 198, 218 (W.D.N.Y. 2024). It applied this Court's reasoning in *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, in which we held that Connecticut's repeal of the religious exemption to its school immunization law, while maintaining the medical exemption, did not violate the Free Exercise Clause. 76 F.4th 130, 156 (2d Cir. 2023). The district court explained that § 2164 was "not materially different" from "Connecticut's mandatory school vaccination regime." *Miller*, 720 F. Supp. 3d at 203. Therefore, *We The Patriots* "compel[led] dismissal" of Plaintiffs' free exercise claim. *Id.* at 202.

The district court also dismissed the free exercise claim that was combined with the parents' right "to regulate the upbringing and education of their children." *Id.* at 218. The district court noted it was "not free to disregard Second Circuit precedent," which does not apply a heightened standard to such "hybrid rights" claims. *Id.* This appeal followed.

---

[10] Dismissing all claims, the district court also denied Plaintiffs' motion for a preliminary injunction as moot. *Miller v. McDonald*, 720 F. Supp. 3d 198, 218 (W.D.N.Y. 2024).

## DISCUSSION

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We review the district court's decision on the motion to dismiss *de novo*, accepting as true the facts alleged in the complaint and drawing all reasonable inferences in Plaintiffs' favor. *We The Patriots*, 76 F.4th at 144. "In addition to the facts alleged in the complaint, 'as a fundamental matter, courts may take judicial notice of legislative history.'" *Id.* at 136 (quoting *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022)).

## I.     Free Exercise Claims

The Free Exercise Clause of the First Amendment applies to the states pursuant to the Fourteenth Amendment, and provides that the states "shall make no law . . . prohibiting the free exercise" of religion. However, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, *J.*, concurring)).

10

A neutral and generally applicable law's burden on religion is constitutional if the law passes the relatively low hurdle of rational basis review—that the state has chosen a means for addressing a legitimate government interest rationally related to achieving that goal. *See, e.g.*, *Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021) (per curiam). If a law is not neutral or generally applicable, however, the government must demonstrate that the law satisfies strict scrutiny, which requires the law "to further 'interests of the highest order' by means 'narrowly tailored in pursuit of those interests.'" *Tandon v. Newsom*, 593 U.S. 61, 64–65 (2021) (per curiam) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)). As the Supreme Court explained in *Smith*, requiring all laws that burden religion to satisfy the demands of strict scrutiny "would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind," including "compulsory vaccination laws." 494 U.S. at 888–89. "[A]dopting such a system would be courting anarchy." *Id.* at 888.

Indeed, the Supreme Court and this Court have consistently viewed immunization laws with approval. In *Jacobson v. Massachusetts*, the Supreme Court held that a state had the power to mandate vaccination against smallpox for adults who were "fit subject[s] of vaccination." 197 U.S. 11, 38–39 (1905). In *Zucht v. King*,

11

the Supreme Court upheld a city ordinance requiring children to present a certificate of vaccination before attending school. 260 U.S. 174, 175–77 (1922). This Court has repeatedly upheld neutral and generally applicable immunization laws in the face of free exercise challenges.[11]

Plaintiffs concede that New York Public Health Law § 2164 satisfies rational basis review—immunization programs reduce disease. However, they argue this case is different from the long line of cases upholding immunization laws because § 2164 is not neutral or generally applicable. Plaintiffs further argue that the law cannot withstand strict scrutiny, and therefore it is unconstitutional as applied to them.

---

[11] *See, e.g.*, *We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 147–48 (2d Cir. 2023) (repeal of Connecticut's religious exemption to its school immunization law was a neutral and generally applicable law and survived rational basis review); *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (per curiam) (temporary school exclusion of children with religious exemptions during chicken pox outbreak not unconstitutional because "New York could constitutionally require that all children be vaccinated in order to attend public school"); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 290 (2d Cir. 2021) (per curiam) (plaintiffs not likely to succeed in showing that mandatory vaccination of healthcare employees without religious exemption was not neutral or generally applicable); *Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021) (per curiam) (vaccine mandate for teachers "plainly satisfies" rational basis review).

### A.    Neutrality

Plaintiffs contend that § 2164's text and the statements of several legislators reveal a discriminatory motive. Rejecting those arguments, the district court concluded that the law did not "target[] religious belief," and that the legislative record revealed "no evidence of hostility." *Miller*, 720 F. Supp. 3d at 210–11. We agree with the district court.

A state "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). "[I]t is not enough for a law to simply *affect* religious practice; the law or the process of its enactment must demonstrate 'hostility' to religion." *We The Patriots*, 76 F.4th at 145.

New York Public Health Law § 2164 is neutral on its face. It does not target or affirmatively prohibit religious practices. *Cf. Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020) (per curiam) (applying strict scrutiny and enjoining regulation that "single[d] out houses of worship for especially harsh treatment"); *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 194 (2d Cir. 2014) (applying strict scrutiny to regulation that targeted only "religious actors performing a religious practice, and during a religious

13

ceremony"). The law simply applies New York's school immunization requirements to *all* schoolchildren who do not qualify for the law's medical exemption. Moreover, the act of repealing the religious exemption did not "in and of itself transmute" this otherwise neutral law into one "that targets religious beliefs." *We The Patriots*, 76 F.4th at 149 (quoting *F.F. ex rel. Y.F. v. State*, 66 Misc.3d 467, 478 (Sup. Ct. 2019), *aff'd sub nom. F.F. v. State*, 194 A.D.3d 80 (3d Dep't 2021)).

Nor does the legislative history reveal an anti-religious bias. Plaintiffs argue that statements made by a small number of legislators, some of whom sponsored the amendments in their respective houses, evidence religious animus. But Plaintiffs have not alleged facts to suggest that those remarks infected "a sizeable portion" of legislators' votes or otherwise influenced the law's enactment. *See United States v. Suquilanda*, 116 F.4th 129, 143–44 (2d Cir. 2024); *see also F.F.*, 194 A.D.3d at 86 (statements from three percent of the legislature did not "taint the actions of the whole" in passing § 2164). To the contrary, the legislative record is full of respectful statements in support of religious freedoms.[12] The final vote

---

[12] *See, e.g.*, N.Y. Sponsor's Memorandum, 2019 S.B. S2994-A, 242d Sess. (acknowledging that "freedom of religious expression is a founding tenet of this nation"); Senate Tr. at 5414 ("I mean, we're talking about freedom of religion; . . . [i]t is not an easy decision."); *id.* at 5451 ("I will be recorded in the negative on this vote, but I do appreciate the debate and the respectfulness with which this issue was approached today.").

14

passing the legislation—84 to 61 in the Assembly and 36 to 26 in the Senate— further reflects the "spirited floor debate among the legislators" and their thoughtful consideration of the interests at stake. *F.F.*, 194 A.D.3d at 86; Bill Jacket at 3–4.

These circumstances differ from where discriminatory intent can be ascribed to a small group of decision-making officials. For example, in *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, the Supreme Court held that statements made by several of seven commissioners were hostile to religion and therefore "cast doubt on the fairness and impartiality" of the administrative enforcement proceeding, particularly given that no one disavowed the substance of the statements. 584 U.S. 617, 634–36 (2018). The remarks were made "by an adjudicatory body deciding a particular case"—"a very different context" from "statements made by lawmakers." *Id.* at 636. Similarly, in *M.A. v. Rockland County Department of Health*, this Court remanded for a jury to consider whether statements made by the two government officials responsible for issuing a challenged emergency declaration evinced religious animus. 53 F.4th 29, 37–38 (2d Cir. 2022).

By contrast, the motives of a small number of legislators cannot be attributed to the legislative body as a whole. A member of the Assembly speaks for himself in the well of the chamber, for each legislator has "a duty to exercise their judgment and to represent their constituents." *Cf. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689–90 (2021). It is "insulting to suggest" that legislators voting for a bill are simply acting at the bill's sponsors' behest. *Id.* at 690. Plaintiffs have not plausibly alleged that § 2164 is not neutral.

## B.  General Applicability

A law is not generally applicable in two circumstances: (1) when the law treats comparable secular conduct more favorably than religious activity, *Tandon*, 593 U.S. at 62, or (2) when "it 'invites' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions,'" *Fulton*, 593 U.S. at 533 (alteration omitted) (quoting *Smith*, 494 U.S. at 884). Plaintiffs argue that both circumstances are present here.

### 1.  Treatment of Comparable Secular Activity

Plaintiffs contend that exempting students for medical reasons treats comparable secular conduct more favorably than religious beliefs. The district court concluded that *We The Patriots* "forecloses the argument that the medical

16

exemption and the repealed religious exemption are comparable." *Miller*, 720 F. Supp. 3d at 217. We agree.

Secular conduct is not always "comparable" to religious conduct. It is "comparable" when the secular conduct poses risks "at least as harmful to the legitimate government interests" justifying the law as posed by the religious conduct incidentally burdened by the law. *See Cent. Rabbinical Cong.*, 763 F.3d at 197; *see also Tandon*, 593 U.S. at 62.

New York's interest in passing § 2164 was in "protect[ing] the health of all New Yorkers, particularly our children," N.Y. Sponsor's Memorandum, 2019 S.B. S2994-A, from "disease outbreaks" by "sustaining a high vaccination rate among school children," Bill Jacket at 4A. When repealing its religious exemption, Connecticut identified effectively the same interest: to "protect the health and safety of Connecticut students and the broader public." *We The Patriots*, 76 F.4th at 151. As such, the same reasons justifying the lack of comparability in *We The Patriots* apply here. Repealing the religious exemption decreases "to the greatest extent medically possible" the number of unvaccinated students and thus the risk of disease; maintaining the medical exemption allows "the small proportion of students" who medically "cannot be vaccinated" to avoid the health consequences

17

that "taking a particular vaccine would inflict." *Id.* at 153. Exempting religious objectors, however, detracts from that interest. Religious exemptions increase "the risk of transmission of vaccine-preventable diseases among vaccinated and unvaccinated students alike." *Id.*

The two exemptions also are meaningfully different in scope and duration. The medical exemption is granted only with "sufficient" documentation of the child's contraindication to "**a specific immunization**." N.Y. Comp. Codes R. & Regs. 10 § 66-1.3(c) (emphasis added). It has limits; it lasts only "until such immunization is found no longer to be detrimental to the child's health," N.Y. Pub. Health Law § 2164(8), and "must be reissued annually," N.Y. Comp. Codes R. & Regs. § 66-1.3(c). Meanwhile, the religious exemption was generalized to *all vaccines* for the duration of that child's school admission. The religious exemption's sweep had a far greater ability to undermine the State's interest in preventing the spread of disease.

Plaintiffs argue that analyzing risk in the aggregate, as we did in *We The Patriots*, misses the point: They note that the risk of transmission of the "tiny" Amish population, who live "in isolated, remote communities," "pales in comparison" to the "sum total of medically unvaccinated children statewide."

18

Appellants' Br. 34–35.  To begin with, we have rejected the notion that the comparability analysis should be governed by a "one-to-one comparison." *Hochul*, 17 F.4th at 287; *see We The Patriots*, 76 F.4th at 152–53 (explaining that the Supreme Court in *Tandon* compared "gatherings that were religious or secular, private or commercial" and that the focus is on "aggregations of individual behaviors, not individual behaviors themselves").  A closer look at the State's interest in passing § 2164 exposes the flaw in Plaintiffs' argument.

New York passed § 2164 in response to the 2018 to 2019 measles outbreak. Legislators felt particularly concerned about the concentration of unvaccinated children with religious exemptions in the same schools.  *See, e.g.*, Senate Tr. at 5385 (noting that the New York City Department of Health traced 44 measles cases, including 26 students with religious exemptions, to one child with a religious exemption); Assembly Tr. at 34; Bill Jacket at 4A.  Plaintiffs allege that nearly all Amish schoolchildren are unvaccinated.  That means their schools are made up of a clustered population of almost 100% unvaccinated students—precisely the circumstances that most concerned the State.  The examples included in the record of measles, pertussis, tetanus, and/or polio recently spreading in certain Amish communities across the nation and in New York demonstrate that **Amish isolation**

19

**does not protect their communities from disease**. Thus, the unique attributes of Amish communities do not present a lesser risk as it pertains to the State's interest in protecting New Yorkers from disease.[13] Plaintiffs have not plausibly alleged that the law favors comparable secular conduct.

### 2. Individualized Exemptions

A law also is not generally applicable when it extends broad discretion to government officials to grant exemptions based on their assessment of "which reasons for not complying" with the law "are worthy of solicitude." *Fulton*, 593 U.S. at 537 (explaining that allowing an official "sole discretion" to grant an exemption "renders a policy not generally applicable"). Plaintiffs contend § 2164's medical exemption creates just that kind of problem. Again, we disagree.

The medical exemption works as follows: A child whose physician certifies that a vaccine "may be detrimental to [the] child's health" does not have to receive that vaccine "until such immunization is found no longer to be detrimental to the child's health." N.Y. Pub. Health Law § 2164(8). "May be detrimental to the

---

[13] Plaintiffs also allege there are 66,000 unvaccinated students without an exemption and other unvaccinated people in schools, such as teachers and maintenance staff. They argue these allegations demonstrate the law is significantly underinclusive. But these wholly speculative allegations, stripped of any context, do not raise an inference of *unfavorable* treatment towards religious conduct.

child's health" means "that a child has a medical contraindication or precaution to a specific immunization consistent with [Advisory Committee on Immunization Practices] guidance or other nationally recognized evidence-based standard of care." N.Y. Comp. Codes R. & Regs. 10 § 66-1.1(*l*). The child's parent must provide a completed medical exemption certification form, "containing sufficient information to identify a medical contraindication to a specific immunization and specifying the length of time the immunization is medically contraindicated." *Id.* § 66-1.3(c). School officials are authorized to ask for "additional information supporting the exemption." *Id.*

New York's medical exemption fits neatly within the contours of other exemptions to immunization that we have held to be constitutionally permissible. The statutory exemption is "mandatory," *We The Patriots*, 76 F.4th at 150, and applies to an "objectively defined" group, *Hochul*, 17 F.4th at 289. In addition, the authority conferred to physicians is not discretionary; a physician's use of her professional medical judgment is limited by the statute and regulations. *Id.* The same is true of the authority conferred upon school officials. Even though school officials have the authority to conclude that the documents submitted in support of a medical exemption contain sufficient (or insufficient) information, they do not

21

have "discretion to approve or deny exemptions on a case-by-case basis" for *any*

*reason*.[14] *We The Patriots*, 76 F.4th at 151; *cf. Fulton*, 593 U.S. at 536–37.

Practically speaking, Plaintiffs argue that school officials have "the power

to press the red or green light on each medical exemption request." J.A. 31. For

example, they allege that up to 50% of students had medical exemptions in one

school while zero students had a medical exemption in another school in the same

community and that medical exemptions are granted inconsistently year to year.

Those allegations do not change our conclusion. Without information about a

student population and its medical needs, there is no way to infer a discretionary

element from the school officials' acceptance of medical exemption requests.

Moreover, for the reasons explained, the statute does not create a system in which

school officials are given improper discretion to evaluate the reasons given for a

requested medical exemption.

*   *   *

---

[14] Plaintiffs argue this conclusion is at odds with *Goe v. Zucker*, in which we described the delegation of "authority to grant a medical exemption" to school officials. 43 F.4th 19, 33 (2d Cir. 2022). The power to accept a child's application is beside the point. The statute does not allow school officials to "decide which reasons for not complying with the policy are worthy of solicitude." *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021).

22

In sum, Plaintiffs have failed to allege that § 2164 is anything but neutral and generally applicable. The district court therefore did not err in applying rational basis review. As noted, Plaintiffs have conceded that the law satisfies rational basis review. *See also Zucker*, 43 F.4th at 32 (finding the protection against disease through immunization a "legitimate" state interest); *We The Patriots*, 76 F.4th at 156 (immunization requirement rationally limited to schools "because only at school is attendance mandated by law"). Accordingly, we affirm the district court's holding that Plaintiffs have failed to allege a free exercise claim.

## II.    Hybrid Rights Claims

The Supreme Court has implied that a neutral and generally applicable law may nonetheless be subject to heightened scrutiny if a free exercise claim is brought "in conjunction with other constitutional protections." *Smith*, 494 U.S. at 881. This Court has characterized that language describing so-called "hybrid rights claims" as dicta, *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001), and has declined to apply a heightened standard of review, *Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003).

Plaintiffs agree with the district court that hybrid rights claims are generally not viewed as viable in this Circuit. *See Miller*, 720 F. Supp. 3d at 218. Yet, they

23

contend their claims should not have been dismissed because they are essentially the same as the claims in *Wisconsin v. Yoder*, 406 U.S. 205 (1972).[15] There, the Supreme Court invalidated a Wisconsin law under the Free Exercise Clause that mandated conventional school attendance until the age of sixteen. *Id.* at 207. Members of the Amish faith challenged the law, seeking to educate their fourteen- and fifteen-year-olds through their "long-established program of informal vocational education." *Id.* at 207, 222. The Supreme Court held that Wisconsin failed to demonstrate an "interest of sufficient magnitude" to overcome "the interests of parenthood" when "combined with a free exercise claim of the nature revealed by this record." *Id.* at 214, 233.

We have observed that the Supreme Court in *Yoder* "took pains explicitly to limit its holding."[16] *Leebaert*, 332 F.3d at 144. The trial record demonstrated that

---

[15] The hybrid rights claims here focus on Plaintiffs' ability to direct the upbringing of *their children*. We therefore assume that these claims are asserted on behalf of only the parent Plaintiffs.

[16] Our sister circuits also have highlighted *Yoder*'s limitations. *See, e.g., Mahmoud v. McKnight*, 102 F.4th 191, 211 (4th Cir. 2024) ("As the Supreme Court itself recognized in *Yoder*, its holding was tailored to the specific evidence in that record regarding how Wisconsin's compulsory secondary education law would have 'inescapabl[y]' coerced the Amish to act or believe in violation of their religious views." (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972))); *Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 250 (3d Cir. 2008) (per curiam) ("*Yoder*'s reach is restricted by the Court's limiting language and the

24

the state law effected a "severe" and "inescapable" burden on the parents' ability to pass onto their children the Amish religion and "the fundamental mode of life mandated by the Amish religion." *Yoder*, 406 U.S. at 217–19. Compulsory high school attendance would take Amish children away "from their community, physically and emotionally, during the crucial and formative adolescent period of life." *Id.* at 211. That removal would "substantially interfer[e] with the religious development of the Amish child and his integration into the way of life of the Amish faith community." *Id.* at 218. One expert opined that compulsory high school attendance would "result in the destruction of the Old Order Amish church community as it exists in the United States today." *Id.* at 212. Wisconsin also failed to offer any evidence to support its purported interests in mandating, at most, two additional years of high school attendance. *Id.* at 221–22.

Plaintiffs' objection to vaccines is premised on the same "fundamental belief that salvation requires life in a church community separate and apart from the

---

facts suggesting an exceptional burden imposed on the plaintiffs."); *Parker v. Hurley*, 514 F.3d 87, 100 (1st Cir. 2008) ("Tellingly, *Yoder* emphasized that its holding was essentially sui generis, as few sects could make a similar showing of a unique and demanding religious way of life that is fundamentally incompatible with *any* schooling system.").

world and worldly influence." *Id.* at 210. They claim that the school immunization law mandates two impossible options: inject their children with vaccines, forcing conduct against their religious beliefs, or forego educating their children in a group setting, requiring them to sacrifice a central religious practice. True, Plaintiffs have shown that § 2164 burdens their religious beliefs and practices; but those burdens are not equivalent to the existential threat the Amish faced in *Yoder*. Unlike in *Yoder*, compliance with § 2164 would not forcibly remove Amish children from their community at the expense of the Amish faith or the Amish way of life.

Moreover, *Yoder*'s holding is limited by the state's interest in protecting public health. In fact, in *Yoder*, the Supreme Court specifically distinguished the facts from *Prince v. Massachusetts*, where the Supreme Court upheld a child labor law against a parent's free exercise challenge. 321 U.S. 158, 159, 170 (1944). The Supreme Court in *Prince* found support from the apparently uncontroversial proposition that a parent "cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds" because the "right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death." *Id.* at 166–67. In *Yoder*,

26

the Supreme Court acknowledged that non-compliance with the school attendance law would not result in any "harm to the physical or mental health of the child or to the public safety, peace, order, or welfare." 406 U.S. at 230. Given the State's interest here—protecting New Yorkers, particularly schoolchildren, from disease—an analogy to *Yoder*'s facts is unconvincing.

Finally, Plaintiffs emphasize that "this case involves the *same* religious group" as in *Yoder*. Appellants' Br. 58. But the Amish have never been exempted from all neutral and generally applicable laws that burden religion. For example, in *United States v. Lee*, the Supreme Court rejected a claim that an exemption for an Amish employer from paying social security taxes was constitutionally required.[17] 455 U.S. at 254. The Supreme Court noted the tax law challenge was "[u]nlike the situation presented in *Wisconsin v. Yoder*," because permitting religious exemptions to the tax system would unduly interfere with the government's

---

[17] *See also, e.g., Gingerich v. Kentucky*, 382 S.W.3d 835, 844 (Ky. 2012) (law mandating the use of slow moving vehicle emblem "aimed at protecting public safety on the highways" was at odds with "Amish way of life" but not unconstitutional); *In re Miller*, 252 A.D.2d 156, 158 (4th Dep't 1998) (photograph requirement on pistol license incidentally affected religious beliefs of Amish but did not violate Free Exercise Clause); *Slabaugh v. United States*, 474 F.2d 592, 593 (6th Cir. 1973) (per curiam) (no exemption from alternate civil service constitutionally required for Amish man classified as a conscientious objector).

significant interest "in maintaining a sound tax system" to the point that it simply "could not function." *Id*. at 259–60.

Similarly, the system of religious exemptions impeded the immunization law from functioning; it resulted in clusters of low vaccination rates and an inability to achieve herd immunity in certain communities. Re-introducing religious exemptions would cut directly against the State's interest in passing § 2164, whereas the exemption permitted in *Yoder* affected only the students who participated in the alternative schooling. *Yoder*'s reasoning does not apply to the circumstances here.

Therefore, we conclude that the district court properly dismissed Plaintiffs' hybrid rights claims.

## CONCLUSION

We have considered Plaintiffs' remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

28